No. 47,569

ATLAS INDUSTRIES, INCORPORATED, a Corporation, *Appellee,* v. NA-
TIONAL CASH REGISTER COMPANY, a Corporation, and HARVEY
SCOTT, *Appellants.*

(531 P. 2d 41)

Opinion filed January 25, 1975.

*Richard C. Dearth,* of Jones & Dearth, Chartered, of Parsons, argued the
cause and was on the brief for the appellants.

*Jack L. Goodrich,* of Parsons, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

OWSLEY, J.: This appeal arises from an action brought by appellee, Atlas Industries, Inc. (Atlas), for the recovery of the purchase price of an accounting machine and accounting system allegedly sold to it by appellant, National Cash Register Company (NCR), through its agent, Harvey Scott. The trial court awarded damages to Atlas in the amount of $5,655.73 based upon the breach of both express and implied warranties. NCR argues the trial court erred in finding that it sold the machine and system in question to Atlas, when in fact it sold the machine to a third party, United States Leasing Company (U. S. Leasing), which in turn leased it to Atlas. Based on these facts NCR contends the transaction does not fall within the scope of Article 2 of the Uniform Commercial Code, and accordingly is barred by the statute of limitations for oral contract actions. (K. S. A. 60-512.)

Atlas, originally doing business under the name of McCulley-Cook, Inc., is a small Kansas corporation engaged in the prefabrication of steel buildings. During the summer of 1967 Atlas decided its business needs were such as to require a more sophisticated accounting system than the simple hand accounting system it was then using. Consequently, the board of directors of Atlas decided to explore the possibility of setting up a machine accounting system.

Soon thereafter Atlas contacted Harvey Scott, a sales representative of NCR, in regard to the acquistion of a suitable accounting system. A demonstration meeting was held in July of 1967 at which time Scott recommended a Model 33 accounting machine and a system based upon an analysis of Atlas' current system of accounting and its future needs. Present at this meeting in addition to Scott were Lee McCulley, president of Atlas; Richard Lowry, attorney-accountant for Atlas; and Ethel Jones, Atlas' bookkeeper. Whereas Scott had been company-trained in accounting, and by his own testimony was an expert in the field, none of the representatives of Atlas possessed such knowledge of accounting and they had to rely substantially on Scott's representations and recommendations.

One week later McCulley informed Scott that Atlas could not afford such an expensive machine. As an alternative Scott suggested that Atlas purchase a used machine which had been factory reconditioned and would cost only half as much. The record indi-

cates Scott represented to McCulley that the used machine would be capable of doing the same job as the Model 33 he had demonstrated earlier. Based on these representations an agreement was reached.

Instead of purchasing the machine directly from NCR, however, Atlas agreed to a lease plan whereby NCR sold the machine to a separate and independent company, U. S. Leasing, which in turn "leased" the machine to Atlas. This type of equipment-leasing arrangement has become common in recent years due to the beneficial tax aspects and the avoidance of the large initial capital outlay otherwise necessary in the purchase of expensive equipment. Through this device a user of goods is able to obtain sole and exclusive use of equipment for a period of time economically beneficial to it. In effect, the leasing company operates as a financing agency for the transaction, with the lessee paying the equivalent to the full purchase price plus interest. The supplier, in this case NCR, gets the benefit of a sale without the burden of having to extend credit.

Under the lease plan NCR had Atlas sign what was denoted as an "Equipment Order and Retail Installment Contract" in which Atlas was referred to as the retail buyer and NCR was aligned as the seller. According to the testimony of Scott, the plan required the customer, Atlas, to pay two or three months' "rent" in advance to NCR, and the contract was sent to U. S. Leasing, a California corporation. U. S. Leasing then either accepted or rejected the customer. If it accepted, as here, it issued a "purchase order" to the supplier for the equipment and leased it to the customer.

Atlas entered into the leasing agreement on or about October 18, 1967, with U. S. Leasing, to lease from said company the accounting machine identified in the retail installment contract. The agreement was termed a lease, and referred to Atlas as lessee and U. S. Leasing as lessor. It provided for sixty monthly payments of $124.43, or a total payment of $7,465.80. The total cost of equipment to the lessor was $5,655.73, which included a sales tax of $164.73. The terms and conditions of the lease included a disclaimer by lessor of any warranty, express or implied, as to any matter whatsoever. The lease specifically stated that no defect or unfitness of the equipment would relieve the lessee of the obligation to pay rent. A provision was included, however, which required the lessor to place a condition in the purchase order authorizing the lessee to enforce in its own name all warranties, agreements and representations which

were made by the supplier to the lessee. In accordance with that requirement such a condition was included in the purchase order contract between NCR and U. S. Leasing. Renewal terms of one year each for a maximum of nine years at the option of lessee were at an annual rate of $124.43 (the amount of monthly payments under the original term). In lieu of renewal, lessee had the obligation of returning the equipment, at its expense, to lessor.

NCR began installing the accounting machine soon after the contracts were executed, but, according to the testimony of Scott, installation was not completed until almost one year later.

Atlas continued to make rental payments to U. S. Leasing until about October 1, 1971. At that time it refused to make further payments, claiming the machine had innumerable mechanical difficulties and that NCR had failed to perform the services and furnish the materials as represented by its agent. U. S. Leasing subsequently sued Atlas for nonpayment of the monthly rentals and an out-of-court settlement was reached requiring Atlas to pay U. S. Leasing the total cost of the machine, $5,655.73.

On October 19, 1971, Atlas filed suit against Scott and NCR, alleging Scott had enticed and encouraged it to enter into the leasing agreement with U. S. Leasing; that as part of the transaction NCR represented and warranted it would furnish all necessary forms and charts of account, would redesign Atlas' bookkeeping system, and would retrain Atlas' personnel in the operations of said machinery and equipment; that NCR further represented and warranted the machinery would be sufficient to handle Atlas' bookkeeping and accounting requirements up to $4,000,000 per annum in sales; but that despite these obligations NCR wholly failed to perform as represented and the system failed to work as promised.

On November 2, 1973, the trial court found generally in favor of Atlas, and specifically that "the warranties, both statutory and implied, written and oral, . . . were breached." The court further found the machine and system furnished and "sold" by NCR to Atlas did not operate in accordance with the recommendations and representations given by its agent, Harvey Scott. In accordance with those findings, Atlas was awarded damages in the sum of $5,655.73.

NCR contends on appeal that the trial court erred in failing to find Atlas' cause of action was barred by the statute of limitations. The contention is based on the application of K. S. A. 60-512 (three-year provision of the Civil Code) rather than K. S. A. 84-2-725 (four-

year provision of the Uniform Commercial Code). NCR argues application of the three-year statute is proper since the four-year statute applies only to "contracts for sale" and the facts disclose no sale arrangement between the parties to this action. NCR also contends that even if the four-year statute of limitations is applicable a disclaimer is contained in the equipment order limiting liability of NCR to six months after delivery against defects in material, workmanship and operational failure from ordinary use, and further limiting liability to correcting the defect or failure.

The threshold question concerns the nature of the relationship between Atlas and NCR, and whether under the facts and circumstances of this case the transaction is subject to the provisions of the U. C. C. If it is, the limitation of actions and the disclaimer provisions of the U. C. C. must be applied and tested. A search of case law relating to similar factual situations reveals several cases involving litigation between the lessor and the lessee (in this case U. S. Leasing and Atlas). A typical case is *Sawyer, etc. v. Pioneer Leasing Corp.*, 244 Ark. 943, 428 S. W. 2d 46, reh. den. 244 Ark. 962A, 430 S. W. 2d 457, which held in an action between lessor and lessee under facts similar to those in the instant case that 2-316 (2) is applicable to leases where the provisions of the lease are analogous to a sale.

Another case is *Hertz Corp. v. Trans. Credit House*, 59 Misc. 2d 226, 298 N. Y. S. 2d 392 (rev'd on other grounds, 64 Misc. 2d 910, 316 N. Y. S. 2d 585), which held in a like situation that an equipment lease was subject to Article 2 of the U. C. C., and particularly the disclaimer of warranty provision of 2-316. Noting the great volume of commercial transactions which are entered into by the device of a lease rather than a sale, the court reasoned that it would be anomalous if such a large body of commercial transactions were subject to different rules of law than other transactions which tend to have the identical economic result. To the same effect is *Fairfield Lease Corp. v. Commodore Cosmetique, Inc.*, 7 U. C. C. Rep. 164 (N. Y. C. Civ. Ct. 1969), and *KLPR TV, Inc. v. Visual Electronics Corporation*, 327 F. Supp. 315 (D. C. Ark. 1971).

Two recent cases from the courts of New York State have taken a contrary view as to the status of the "lessor" and classified the lease agreement as a "title retention contract and lease intended as a security." In *Leasco Data Proc. v. Starline*, 74 Misc. 2d 898, 346 N. Y. S. 2d 288, the court said:

"Plaintiff and defendant, two corporate entities, dealing at arm's length through officers and agents (presumably well advised, alert, knowledgeable businessmen) negotiated a written contract which by its terms required plaintiff to purchase a *defendant-specified*, sophisticated billing machine from a *defendant-designated* seller of such machines and lease it to defendant for five years and five months at a fixed monthly rental of $274.20 to be paid by defendant, with the option to defendant of renewing the lease at its expiration for a nominal *yearly* rental of $274.20, the same amount as the *monthly* rental during the term. . . .

.   .   .   .   .   .   .   .   .   .   .   .   .

"A proper construction of the written leasing agreement must find it to be a 'title retention contract and lease . . . intended as security' within the meaning of subdivision (2) of section 9-102 of the Uniform Commercial Code, designed to afford defendant the advantage of having the possession and use of its own free choice of a particular machine throughout its usable expectancy, by means of long-term installment payments of $274.20 per month without the large, initial outlay of $13,710 necessary to outright purchase.

"Subdivision (37) of section 1-201 of the Uniform Commercial Code defines 'security interest' as 'an interest in personal property . . . which secures payment . . . of an obligation.' And goes on to say 'whether a lease is intended as security is to be determined by the facts of each case; however . . . an agreement that upon compliance with the terms of the lease the lessee . . . has the option to become the owner of the property . . . for a nominal consideration does make the lease one intended for security.'

.   .   .   .   .   .   .   .   .   .   .   .   .

"Article 2 of the Uniform Commercial Code (Sales), at section 2-102, expressly excludes from the application of its provisions (Uniform Commercial Code, § 2-101 to and including § 2-725) 'any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction.' " (pp. 899, 900, 901.)

A more detailed statement as to reasons for finding a "lease agreement" to be a security agreement is found in *In re Sherwood Diversified Services, Inc.,* 382 F. Supp. 1359, (S. D. N. Y. 1974). The court said:

"Sherwood, if acting as a financing agency, would not be considered a buyer or seller of the goods. The pivotal issue, then, is to determine whether Sherwood was acting as a financing agency or as a seller. This Court agrees with the Bankruptcy Judge that the proper method for analyzing the transactions in question is to 'look through' the form of the agreement and to examine the intent of the parties and the facts and circumstances which existed at the time of the agreements. Pursuant to this approach, the following factors become pertinent: (1) the equipment ordered by the purchaser-lessees was shipped directly to them by the manufacturer-vendors; (2) Sherwood would remit the full sales price plus any applicable sales tax to the manufacturer-vendors; (3) the purchaser-lessees had often placed purchase orders with the manufacturers-vendors prior to approaching Sherwood for financing; (4) Sherwood did not select or inspect any of the equipment; (5) the lessees were

given options to purchase the equipment for nominal sums, usually from $1.00 to $10.00; (6) U. C. C. financing statements were executed and delivered to the lessees and filed by Sherwood; (7) the agreements were almost always discounted with a bank or other lending institution; (8) the monthly payments under the lease were calculated to return to Sherwood the purchase price, sales tax, interest and filing fees; (9) Sherwood does not maintain a warehouse for the storage of machinery and equipment; (10) Sherwood did not carry the leased property as assets on its books but rather as accounts receivable; (11) Sherwood did not take any depreciation deductions on the equipment; and (12) Sherwood has never taken possession of any of the leased equipment at the end of the leased term.

"The combined effect of these factors supports not only the conclusion that the equipment lease transactions were security agreements, but also the fact that Sherwood was a 'financing agency' and not a 'seller' of the equipment. . . ." (pp. 1363, 1364.)

In the instant case three documents were executed which must be considered and construed in order to determine the relationship between the parties. The first was entitled "Equipment Order and Retail Installment Contract." This document was executed by both Atlas and NCR, as well as by U. S. Leasing. We should note that both Atlas and U. S. Leasing were listed as purchasers. The document also contained the six-months disclaimer provision hereinbefore mentioned.

The second document, entitled "Purchase Order," was signed by U. S. Leasing and referred to NCR as supplier of equipment. This document provided that NCR would comply with all warranties, agreements and representations made by it to lessee Atlas; and NCR agreed that all warranties, agreements and representations made by it to Atlas and to U. S. Leasing would be fully enforceable by U. S. Leasing or by Atlas in its own name.

The third document is identified as a "Lease" and lists Atlas as lessee, U. S. Leasing as lessor, and NCR as supplier of equipment. The lease provided U. S. Leasing would include as a condition of its purchase order that NCR would authorize Atlas to enforce in its own name all warranties, agreements, and representations, if any, which were made by NCR to Atlas or to U. S. Leasing, and that U. S. Leasing made no express or implied warranties as to any matter, including fitness for any particular purpose. It appears from the copy of the lease shown in the record that NCR did not sign this document.

It is a well settled principle of law that where two or more documents are executed by the same parties at or near the same time in the course of the same transaction and concern the same subject

matter they will be read and construed together. (*Topeka Savings Association v. Beck*, 199 Kan. 272, 428 P. 2d 779.) This rule should also apply if the parties involved comply with the provisions of interrelated documents although one of the documents was not executed by a party to the transaction. Construction of the involved documents is also subject to the rule that the true nature and character of a document is not determined by the name attached thereto but by the intent of the parties as reflected by the terms or the contents thereof. (*Atwell v. Maxwell Bridge Co.*, 196 Kan. 219, 409 P. 2d 994.) It follows that the three described documents should be read and construed together and although the third document is called a lease its true nature and character should be determined by the intent of the parties as reflected by its terms and conditions.

Extensive research fails to disclose any cases involving disputes between the lessee (here Atlas) and the supplier (here NCR). In order to determine the relationship between Atlas and NCR it is necessary to determine the relationship between Atlas and U. S. Leasing. Based on the general rules of construction and the reasoning of the cases cited herein, we conclude U. S. Leasing was a financing agency and as such held a security interest in the subject matter of the transaction. This conclusion is based on the following: (*a*) The equipment ordered was shipped and installed by NCR; (*b*) U. S. Leasing did not select or inspect the equipment; (*c*) U. S. Leasing was not a manufacturer or dealer in like equipment; (*d*) the monthly payments under the lease were calculated to return to U. S. Leasing the purchase price, sales tax, and interest; (*e*) is was not contemplated the equipment would be returned to U. S. Leasing; and (*f*) the renewal rental was for a nominal amount and extended to a period beyond the usable life of the equipment.

A realistic approach to the role played by NCR in this transaction results in the conclusion that NCR was the seller. The record clearly discloses NCR dealt in accounting machines and solicited purchasers through its sales force. The designation of the parties to this lawsuit as buyer and seller is in harmony with those provisions of the written instruments involved, fixing responsibility of NCR for all warranties made to Atlas. The only deterrent in designating NCR as seller was the possibility that we would be required to assign the role of seller to U. S. Leasing. Having eliminated U. S. Leasing from that role, we are free to designate NCR as seller. In these circumstances we conclude the provisions of the U. C. C. are

applicable to this transaction, including 2-725 (four-year statute of limitations) and 2-316 (2) (disclaimer of warranties).

Having determined that Article 2 of the U. C. C. applies to the present transaction, we are left with the question of whether suit was brought within four years after the cause of action accrued. Subsection (2) provides that a cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. Furthermore, the subsection provides that a breach of warranty occurs when "tender of delivery" is made, with the exception that if the warranty explicitly extends to future performance of the goods the cause of action accrues when the breach is or should have been discovered.

Under the facts and circumstances of this case we conclude that tender of delivery of the accounting machine, sold to Atlas by NCR and installed by NCR in Atlas' plant, did not occur until installation of the machine was completed. Scott testified it took approximately six months to complete the installation. By his own admission, "[i]t was in March or April of 1968 before the machine was completely installed and operational." The record shows Atlas instituted the present action on October 19, 1971, within four years of the date of installation. This result is consistent with the intent of 2-725 and recent cases considering this issue. (*Val Decker Packing Co. v. Corn Products Sales Co.*, 411 F. 2d 850 [6th Cir. 1969].)

NCR argues that even if we decide the four-year statute of limitations governs, the warranties in the transaction were limited to those contained in the agreement, and the agreement takes precedence over any oral or implied warranties. NCR is referring to the provision in the "Equipment Order and Retail Installment Contract" which limits NCR's liability to defects in material, workmanship and operational failure from ordinary use during a period of six months after delivery. Examination of the disclaimer discloses no effort to make it conspicuous; in fact, the provision for disclaimer is in much smaller type than the other provisions of the contract. K. S. A. 84-2-316 (2) provides that in order to "exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." See also *Christopher & Son v. Kansas Paint & Color Co.*, 215 Kan. 185, 523 P. 2d 709.

NCR argues this action was not based on an implied warranty and the requirement that the disclaimer be "conspicuous" is not applicable. The petition alleges NCR warranted the equipment

would be sufficient to handle the bookkeeping and accounting requirements of the business. Such an allegation could be supported by either an oral express warranty or by an implied warranty of fitness as set forth in 2-315. We see no merit in NCR's claim that Atlas cannot rely on an implied warranty. Discovery in its broadest scope is available under the code of civil procedure. The need for technical pleading has vanished. We now require only a bare bones pleading which outlines the nature of the claim. (Gard, Kansas Code of Civil Procedure Annotated, § 60-208 [a], p. 31.)

Under the facts and circumstances of this case, and for the reasons herein stated, we conclude the transaction herein described is subject to the provisions of the U. C. C. and resulted in a buyer-seller relationship between Atlas and NCR with a security interest in U. S. Leasing.

The judgment is affirmed.