**EARMAN OIL COMPANY, INC. and Courtesy House, Inc., Florida Corporations, Plaintiffs-Appellants,**

v.

**BURROUGHS CORPORATION, a Michigan Corporation, Defendant-Appellee.**

No. 78–1785.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1980.

**1292**

Calvin B. Brown, Ralph L. Evans, Vero Beach, Fla., for plaintiffs-appellants.

Smith, O'Haire, Thatcher & Quinn, Sherman N. Smith, III, Thomas Thatcher, Vero Beach, Fla., for defendant-appellee.

Before TUTTLE, BROWN and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Inappropriate for certification because of the unusual posture of the issues and their straightforward, settled nature,[1] this case takes us down the Florida law spur of *Erie R. R. v. Tompkins.*[2] A number of questions line the tracks. When is a lease not a lease? What effect should be given to the terms of a contract which was executory and was in a sense not carried out by the parties? How can disclaimers and limitations of liability be unconscionable as a matter of law? To find the answers, we look to Florida's general contract law and to its version of the Uniform Commercial Code, Fla.Stat. §§ 671.101 *et seq.* ("Code" or "U.C.C.").[3]

---

[1]. Brown, *Certification—Federalism in Action*, 7 Cum.L.Rev. 455 (1977). Florida does permit certification. Fla.Stat.Ann. § 25.031; Fla. App.R. 9.510; *National Education Assoc., Inc. v. Lee County Board of Public Instruction*, 448 F.2d 451 (5th Cir. 1971), *on certification*, 260 So.2d 206 (Fla.1972), *on receipt of answers to certification*, 467 F.2d 447 (1972).

[2]. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Diversity jurisdiction is present. 28 U.S.C.A. § 1332. The parties agree that Florida law applies.

[3]. The Florida Code provisions involved in this appeal are identical to the Uniform Commercial Code provisions as amended in 1972. Citation of Florida Code provisions will be in "U.C.C." form, *e. g.*, U.C.C. § 1–101 instead of Fla.Stat. § 671.101.

A three-party transaction is the subject of this appeal. Earman Oil Company was the user of a Burroughs Model L 8800–100 computer.[4] The supplier of the computer was Burroughs Corporation. The computer was technically sold by Burroughs to the third party—National Equipment Rental Limited (NER). Simultaneously, NER leased the computer to Earman. Burroughs sent the computer directly to Earman, which in turn made "rental" payments to NER.

This common arrangement leads to little trouble until the user feels that the computer has, so to speak, gone awry. Then there is litigation.[5] So it is here. Earman, having no recourse against NER, brought claims for breach of implied and express warranties and for tortious misrepresentation against Burroughs. Earman further narrowed these claims in the District Court. That Court rejected the narrowed claims. On appeal, we affirm.

This trouble began in 1975 when Earman and a Burroughs representative agreed that Earman needed a Burroughs computer. For financial reasons, Earman decided not to try to buy the computer outright, however. Instead, the computer was to be sold to a leasing company which would then lease to Earman. First, however, Burroughs had to locate an agreeable leasing company. So Burroughs asked Earman to sign a contract purporting to sell the computer and associated hardware directly to Earman. That "Equipment Sale Contract" (ESC) identified the computer by model type but not by serial number, and showed a price of approximately $26,155.

Five days later, Burroughs had located NER to act as leasing company and Ear-

man signed a lease for the equipment previously designated in the ESC, with the exception of one immaterial item. At the end of the lease, Earman was to redeliver the computer to NER.

NER countersigned the lease seven days later and simultaneously executed a purchase order to Burroughs for the same model computer and associated hardware. The purchase order designated Earman as lessee. A few months later the leased computer was installed. Allegedly there was trouble from the start, which Burroughs attempted to remedy. Many attempts and two years later, Earman brought this suit against Burroughs.

The thrust of Earman's complaint was that Burroughs: (i) breached its oral express warranties; (ii) breached its implied warranties of fitness for a particular purpose and of merchantability; and (iii) tortiously misrepresented the qualities of its computer. In defense, Burroughs asserted that exculpatory provisions of the ESC, signed by Burroughs and Earman, protected Burroughs from liability.

Earman's counterattack was three-pronged. First, Earman argued that the real economic effect of the transactions involving NER was important in determining whether the previously executed ESC could be accorded any significance. If NER was a true lessor and was not acting solely as a financing agent, then the real economic effect of the three-party transaction was a sale by Burroughs to NER. Earman argued that this meant that the ESC must be treated as a nullity and that only the provisions of the purchase order in the sale to NER could be accorded significance. Second, Earman argued that the purchase

---

4. The computer, with associated hardware and software, was intended to process Earman's payroll, record certain of its sales and purchases, and provide accounting information.

5. There have been an enormous number of suits in which disgruntled computer users have attempted to sort out their rights where both computer vendors and so-called lessors have been involved. *See, e. g., Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir. 1979); *Chatlos Systems, Inc. v. National*

*Cash Register Corp.*, 479 F.Supp. 738 (D.N.J. 1979); *National Equipment Rental, Ltd. v. Priority Electronics Corp.*, 435 F.Supp. 236 (E.D. N.Y.1977); *Granite Equipment Leasing Corp. v. Acme Pump Co.*, 13 U.C.C.Rep. 707 (Conn.Sup. Ct.1973); *Computer Sciences Corp. v. Sci-Tek, Inc.*, 367 A.2d 658 (Del.Super.1976); *Leasco Data Processing Equipment Corp. v. Starline Overseas Corp.*, 74 Misc.2d 898, 346 N.Y.S.2d 288 (App.T., 1st Dept. 1973); and cases cited below in this opinion.

order contained no effective exculpatory provisions. Asserting that it was a third party beneficiary of the purchase order, Earman concluded that by virtue of the purchase order it could recover against Burroughs on theories of express and implied warranty. Third, Earman contended that even if the restrictions of the ESC were applicable, they were unconscionable and therefore unenforceable.

In order to clarify the legal issues and especially the unconscionability claim, the District Court held a pre-trial hearing. There, the Court first held as a matter of law—though not fact—that the ESC's restrictions were not unconscionable. Second, as a matter of law, the Court held that the exculpatory language of the ESC governed the relationship between Earman and Burroughs. That conclusion was based on two alternative grounds: (i) That the real economic effect of the transaction was a sale between Earman and Burroughs with NER having only a financing interest in the equipment; or (ii) if NER had more than a financing interest, the restrictions of the ESC were nonetheless applicable to Earman's suit as a matter of contract interpre-

tation. Either way, Earman's claims would be subject to defenses based upon the ESC's disclaimers,[6] damage limitations,[7] and integration provisions.[8]

Upon the Court's ruling, Earman was granted a recess in order to consider the situation. Earman's position at the hearing and its interpretation of the issues and facts in the pre-trial stipulation were largely dependent on a favorable ruling with respect to the ESC.[9] Given the adverse resolution of that issue and the unconscionability issue, Earman decided during the recess not to proceed to trial on the remaining factual issues. Without asking the District Court to proceed to trial on unresolved factual issues, Earman requested the entry of final judgment, which was duly granted.

Earman then brought this appeal. Essentially the same three issues considered by the District Court in its pre-trial ruling are contested by Earman.[10] Thus we are asked to determine the real economic effect of the transaction, to decide whether the ESC's exculpatory provisions apply, and to find whether those provisions are unconscionable.

6. No representation or other affirmation of fact not set forth herein, including but not limited to statements regarding capacity, suitability for use, or performance of the equipment shall be or be deemed to be a warranty by Burroughs for any purpose, nor give rise to any liability or obligation of Burroughs whatever.

EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES EXPRESS OR IMPLIED INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7. IN NO EVENT SHALL BURROUGHS BE LIABLE FOR LOSS OF PROFITS OR OTHER ECONOMIC LOSS, INDIRECT, SPECIAL, CONSEQUENTIAL, OR OTHER SIMILAR DAMAGES ARISING OUT OF ANY BREACH OF THE AGREEMENTS OR OBLIGATIONS UNDER THIS AGREEMENT.

BURROUGHS SHALL NOT BE LIABLE FOR ANY DAMAGES CAUSED BY DELAY IN DELIVERY, INSTALLATION OR FURNISHING OF THE EQUIPMENT OR SERVICES UNDER THIS AGREEMENT.

8. The Customer agrees that this Agreement constitutes the entire agreement, understanding and representations, expressed or im-

plied, between the Customer and Burroughs with respect to the equipment, and/or related services to be furnished hereunder and that this Agreement supersedes all prior communications between the parties including all oral and written proposals.

9. For example, the pre-trial stipulation indicates that the admissibility of prior representations made by Burroughs would be a question of law which would turn on the applicability of the ESC's integration clause.

10. Conversely, the misrepresentation claim, which was not pressed in the District Court, is likewise not asserted on this appeal. That claim is therefore deemed abandoned. *Galtieri v. Wainwright*, 582 F.2d 348, 352 n. 8 (5th Cir. 1978) (en banc). We in any event feel that the misrepresentation claim is in essence a contract-related claim and thus redundant and impermissible. *See, e. g., Closed Circuit Corp. of America v. Jerrold Electronics Corp.*, 426 F.Supp. 361, 364 (E.D.Pa.1977); *Investors Premium Corp. v. Burroughs Corp.*, 389 F.Supp. 39, 45–46 (D.S.C.1974); *Westfield Chemical Corp. v. Burroughs Corp.*, 21 U.C.C. 1293 (Mass.Super.Ct.1977).

We do not decide whether further fact-finding might permit Earman to prevail. Earman's case below was predicated on a favorable resolution of the issues of law. Except for an ambiguous reference in the conclusion of its appellate brief,[11] Earman does not now seek reversal for lack of fact-finding. Furthermore, the factual aspects of Earman's claims were not properly raised in the District Court. To the extent that any are now being raised for the first time on appeal, we will not consider them. *Fishing Fleet, Inc. v. Trident Insurance Co.*, 598 F.2d 925, 926 n. 1 (5th Cir. 1979). We now proceed to the legal issues properly placed before us by Earman.

Earman first urges us to decide whether or not the three-party transaction had the real economic effect of a sale by Burroughs to Earman. In form, the transaction consisted of a sale to NER followed by a lease of the equipment to Earman. Thus, in form there was no *completed* sale of the equipment directly to Earman.

Earman's primary position is that the subsequent sale to NER had real economic substance. Therefore the lease by NER to Earman was not a financing arrangement nor a subterfuge for taking a security interest in the equipment. If a "true" leasing arrangement was involved, then Earman argues that the NER purchase agreement with Burroughs is of greater significance while the earlier executed ESC between Burroughs and Earman becomes insignificant.

■ If, on the other hand, NER's lease was not a true lease but rather a financing arrangement, Earman acknowledges that there is more precedent for giving effect to the ESC. Nonetheless, Earman asserts that its position is distinguishable and that the ESC should not apply.[12]

We need not resolve the issue of the transaction's character in order to decide this appeal, however. We find that either resolution of the issue leads to the same disposition of the appeal. We first assume that the lease was a true lease.

## I. If A True Lease

If the lease was a true lease, Earman argues that the only sale of the equipment was from Burroughs to NER. That contract is set out by NER's purchase order. The purchase order expressly designates Earman as intended lessee. Because Earman is so designated it is persuasively argued that Earman is a third party beneficiary with the right to enforce the provisions of the purchase order. *American Empire Insurance Co. of South Dakota v. Fidelity & Deposit Co. of Maryland*, 408 F.2d 72 (5th Cir. 1969); *Weimar v. Yacht Club Point Estates, Inc.*, 223 So.2d 100 (Fla.App. 1969).

As third party beneficiary, Earman first argues that it is entitled to enforce the implied warranty rights of NER against Burroughs. Earman recognizes, however, that its implied warranty theory is made difficult by two terms of the NER-Burroughs contract, as set out on NER's purchase order form. One term, left partially uncompleted, was rubber-stamped onto the purchase order by Burroughs:

> By the below signature of buyer, or his authorized representative, the sale of this equipment shall be governed by the terms and conditions contained in agreement Form No. _____, the receipt of copies of which are hereby acknowledged by the buyer. Further, the buyers purchase order printed terms and conditions herein are null and void.

---

**11.** "Plaintiffs assert that the Lower Court erred in ruling . . . without having first elicited facts. . . ."

**12.** The available evidence—the circumstances surrounding the transaction and provisions of the lease—suggests that the transaction was a financing arrangement rather than a lease. But there is no evidence relating to the anticipated economic value of the equipment over the term

of the lease. Without evidence of this essential factor, we cannot characterize the transaction with certainty. *See Davis Brothers v. Misco Leasing, Inc.*, 508 S.W.2d 908, 76 A.L.R.3d 1 (Tex.Civ.App.1976); *Granite Equipment Leasing Corp. v. Acme Pump Co., supra; Peco, Inc. v. Hartbauer Tool & Die Co.*, 262 Or. 573, 500 P.2d 708 (1972).

The period of normal maintenance coverage applicable to equipment purchased hereunder is _____ months.

This term is stamped on the face of the purchase order, directly below the description of the equipment purchased. That placement and the fact that the term is rubber-stamped, tends to make the term conspicuous even though the print of the term is smaller than that used in the rest of the purchase order. This term obviously refers to the ESC, which contains the disclaimers and limitations of liability which seemingly defeat Earman's claims.

Even if for some reason the rubber-stamped term does not apply, another term of NER's purchase order form also indicates that the provisions of the ESC apply to Earman's claims (emphasis supplied):

> You [Burroughs] warrant that EQUIPMENT will comply with all warranties, agreements and representations made by you to LESSEE [Earman], "By your acceptance [Burroughs's acceptance] of this order and invoice to us [NER], you agree that you will make available to LESSEE [Earman] and will permit LESSEE [Earman] to enforce against you your *standard* representations, warranties and service obligations *in the same manner as if LESSEE [Earman] were the purchaser of the EQUIPMENT."*

This term is an integral part of the purchase order form, printed in a type size equal to that of other portions of the form.

Earman launches an innovative attack on these two terms. Earman argues that the terms (i) are not conspicuous and (ii) do not mention the word "merchantability." Therefore, under U.C.C. § 2–316(2),[13] the terms are insufficient to disclaim (i) all implied warranties and (ii) the implied warranty of merchantability, respectively. Since those implied warranties are not effectively disclaimed, Earman concludes that it may recover as a third party beneficiary of NER's implied warranty rights.

■ The obvious weakness in Earman's attack is that those terms of the purchase order are not warranty disclaimers in the first place. It is unimportant that the terms may not meet § 2–316(2)'s requirements. Clearly perceived, the second of the terms is an *express* grant of third party beneficiary rights to Earman but conditioned with an incorporation of Burroughs's *"standard* representations, warranties and obligations" (emphasis supplied). The term expressly provides that "all warranties, agreements and representations" made by Burroughs to Earman are to be enforceable by Earman. By specifying that Earman was to be treated as a "purchaser" and by referring to Burroughs's "standard" representations, the language itself seemingly

---

**13. Exclusion or Modification of Warranties**

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2–718 and 2–719).

incorporates the prior dealings of Burroughs and Earman. Those prior dealings encompass the ESC and its exculpatory provisions. We find that this language is sufficient to condition Earman's third party rights to the terms and conditions of the ESC, which embodies all of the prior dealings of Earman and Burroughs.

■ Furthermore, the first term, though not filled in, was an obvious attempt to incorporate by reference the terms and conditions of the ESC. The Code provides that a course of dealing between the parties is relevant to the interpretation of uncertain, incomplete terms.[14] The dealings between Earman, Burroughs, and NER certainly indicate that the incomplete portion of the purchase order was intended to refer to the ESC, thereby incorporating it by reference.

■ That Earman's third party rights under the purchase order are governed by the ESC's terms and conditions is further supported by a venerable principle of contract law. In a computer lease case almost identical in facts to the instant one, the Kansas Supreme Court stated:

> It is well settled principle of law that where two or more documents are executed by the same parties at or near the same time in the course of the same transaction and concern the same subject matter they will be read and construed together.

*Atlas Industries, Inc. v. National Cash Register Co.*, 216 Kan. 213, 220, 531 P.2d 41, 46–47 (1975) (citing *Topeka Savings Association v. Beck*, 199 Kan. 272, 428 P.2d 779 (1967). The principle applies to documents executed in the course of a transaction even though they are executed days or weeks apart. Florida recognizes this contemporaneous transaction principle. *J. M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So.2d 484 (Fla.1957); *Northwestern Bank v. Cortner*, 275 So.2d 317 (Fla.App.

1973) (loan guarantee was subject to terms of loan agreement, yet was executed several days before the loan agreement was executed).

The documents involved in the instant case were executed over a 12-day period and manifestly concerned the same transaction. Reading the lease, purchase order, and ESC together is therefore appropriate. Although viewed in isolation the ESC was executory, when it is viewed as part of the entire transaction it is apparent that the ESC's statement of rights and obligations continues to govern Earman's relationship with Burroughs. The purchase order (and even, more obliquely, the lease),[15] incorporates the ESC in the context of defining Earman's rights. Thus the ESC governs Earman's rights with respect to Burroughs.

## II. If A Financing Arrangement

■ For much the same reasons, no different result is reached if the lease was a financing arrangement rather than a true lease. Again the contemporaneous transaction principle requires that we construe the three documents together. Assuming now that the lease was a financing arrangement, the real economic effect of the transaction was a sale direct from Burroughs to Earman. That effect coalesces with the ESC's express purpose: a sale direct from Burroughs to Earman. The coalescence is all the more reason, under the contemporaneous transaction principle, to give effect to the ESC's unambiguous statement of Earman's rights against Burroughs. As stated by the Kansas Supreme Court, "it would be anomalous if . . . commercial transactions [which are entered into by the device of a lease rather than a sale] were subject to different rules of law than other transactions which tend to have the identical economic result." *Atlas Industries, Inc. v. National Cash Register Co., supra,* 216

---

**14.** A course dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

**15.** The lease states that: "Lessee [Earman] shall look to Vendor [Burroughs] for all hardware, software and programming deficiencies, which are not Lessor's [NER's] responsibility."

U.C.C. § 1–205(1). *See* J. White & R. Summers, Uniform Commercial Code § 3–3 (1972).

Kan. at 218, 531 P.2d at 45 (discussing and approving of the reasoning in *Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House*, 59 Misc.2d 226, 298 N.Y.S.2d 392 (1969), *rev'd on other grounds*, 64 Misc.2d 910, 316 N.Y.S.2d 585 (1st Dept. 1970)).

### III. Application

■ Subject to Earman's claim of unconscionability, our remaining task is to apply the terms and conditions of the ESC to Earman's breach of warranty claims. The ESC contains an integration provision. *See* note 8 *supra*, for text. We find the integration provision sufficient to prevent the consideration of prior representations by Burroughs. Several other Courts which have construed Burroughs's ESC unanimously agree. *Bakal v. Burroughs Corp.*, 74 Misc.2d 202, 343 N.Y.S.2d 541 (1972); *Investors Premium Corp. v. Burroughs Corp.*, 389 F.Supp. 39 (D.S.C.1974) (S.C.); *Byrd Tractor, Inc. v. Burroughs Corp.*, Civ.No. 77–30–A (U.S.E.D.Va., Aug. 8, 1977) (Va.). We are therefore confined to the four corners of the ESC (subsequent documents not being inconsistent), the interpretation of which is a matter of law. *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 532 F.2d 166, 171 (10th Cir. 1976); *Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc.*, 454 F.Supp. 511 (W.D. Okla.1977).

■ The ESC contains terms disclaiming warranties and limiting liability. *See* notes 6 & 7 *supra*, for text. Earman does not argue that these terms are ineffective. The terms are in type larger than the surrounding terms and meet U.C.C. § 1–201(10)'s definition of being "conspicuous." [16] The implied warranties disclaimer includes the word "merchantability." Thus the implied warranties disclaimer fully complies with the requirements of U.C.C. § 2–316(2).[17] The disclaimer of express warranties also complies with the Code's requirements. U.C.C. § 2–316(1).[18] Likewise the limitation of liability terms are effective. The ESC included a three-month maintenance and repair warranty. Consequently, the requirements of U.C.C. § 2–719 [19] are met. Our resolution of this essentially uncontested point is again supported by other Courts. *Bakal v. Burroughs Corp., supra* ; *Investors Premium Corp. v. Burroughs Corp., supra; Westfield Chemical Corp. v. Burroughs Corp.*, 21 U.C.C.Rep. 1293 (Mass.Super.Ct. 1977); *Byrd Tractor, Inc. v. Burroughs Corp., supra*. See *Delta Air Lines, Inc. v. McDonnell Douglas Corp.*, 503 F.2d 239 (5th Cir. 1974); *Wyatt Industries, Inc. v. Publicker Industries, Inc.*, 420 F.2d 454 (5th Cir. 1969); *W. R. Weaver Co. v. Burroughs Corp.*, 580 S.W.2d 76 (Tex.Civ.App.1979).

Because of the ESC's exculpatory provisions, Earman's claims must fail unless those provisions are unconscionable. It is Earman's last contention that the ESC's

---

**16.** The Code states:

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. . . . Language in the body of the form is "conspicuous" if it is in larger or other contrasting type or color. . . .

**17.** *See* note 13 *supra*, for text.

**18.** *See* note 13 *supra*, for text.

**19.** **Contractual Modification or Limitation of Remedy**

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

exculpatory provisions are unconscionable and therefore recovery against Burroughs is possible.

### IV.  Unconscionability

■ Based on the documents and the stipulated and admitted facts, Earman claims that the ESC's exculpatory provisions are unconscionable as a matter of law.[20] The burden of proof for this affirmative defense is on Earman. *Mobile America Corp. v. Howard,* 307 So.2d 507, 508 (Fla.App.1975). Earman contends that there are sufficient facts to show overreaching and unfair conduct by Burroughs, rendering the ESC's provisions unconscionable.

Unconscionability is allegedly shown by the relatively short period between signing of the ESC and the lease; the fact that there were only two or three meetings between Earman and Burroughs's representative prior to the signings; and the fact that Earman was in the business of selling oil and oil products and was therefore presumably unfamiliar with computers.  Earman asserts that those bare facts fulfill all but the last two considerations necessary for unconscionability under *Potomac Electric Power Co. v. Westinghouse Electric Corp.,* 385 F.Supp. 572 (D.D.C.1974), *rev'd & remanded on other grounds* 527 F.2d 853 (D.C. Cir.1975):[21] (i) examination of the negotiation process as to length of time in dealing; (ii) the length of time for deliberations; (iii) the experience or astuteness of the parties; (iv) whether counsel reviewed the contract; and (v) whether the buyer was a reluctant purchaser.

■ The facts asserted by Earman are not sufficient to show unconscionability. The number of meetings between the parties by itself indicates nothing about the length, nature, or fairness of negotiations. The period of time between the signing of documents does not mean that Earman's deliberations concerning the transaction were limited to that period.  Nor does Earman's involvement in the oil industry impune the experience or astuteness of its negotiator.  Earman has not shown a lack of legal guidance and if anything the record suggests Earman was a willing party to the transaction.

---

**20.**  U.C.C. § 2–302 provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

We do not decide, as the District Court apparently did, whether disclaimers valid under U.C.C. § 2–316 are always immune from an unconscionability attack under U.C.C. § 2–302. There is a split in authority as to whether § 2–316 preempts § 2–302's operation on disclaimers.  *Compare* Leff, *Unconscionability and the Code—The Emperor's New Clause,* 115 U.Pa.L.Rev. 485, 523 (1967) (preempts) *with Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69 (1960) (pre-Code case, doesn't preempt).

In a pre-Code decision, a Florida appellate court seemingly adopted the preemption viewpoint. *Desandolo v. F & C Tractor and Equipment Co.,* 211 So.2d 576 (Fla.App.1968).  The decision has been applied to Code issues in other Florida appellate court decisions, though without any elaboration. *Alterman Transport Lines v. Equilease Corp.,* 266 So.2d 45 (Fla. App.1972); *Lopez v. Losada Truck and Equipment, Inc.,* 329 So.2d 366 (Fla.App.1976).  *See also* U.C.C. § 2–719, Official Comment 3 (stating, in a discussion of unconscionability, that "[t]he seller in all cases is free to disclaim warranties in the manner provided in Section 2–316").  The damage limitation provision, though without significance if the disclaimers effectively bar a remedy, is apparently not subject to a preemption argument, since § 2–719(3), governing such provisions, expressly permits an unconscionability claim.

Because we decide that there was not unconscionability in this case, we do not decide whether Florida law would permit unconscionability to render unenforceable a provision valid under §§ 2–316 or 2–719.

**21.**  Reversal was only to permit additional discovery.  *See American Electric Power Co. v. Westinghouse Electric Corp.,* 418 F.Supp. 435, 453 n.28 (S.D.N.Y.1976).

The procedural sort of unconsciona-bility alleged by Earman requires a showing· of overreaching or sharp practices by the seller and ignorance or inexperience on the buyer's part, resulting in a lack of meaning-ful bargaining by the parties. *See general-ly* J. White & R. Summers, *supra* § 4–3. In commercial settings such as the instant one, businessmen are presumed to act at arms length. *Westfield Chemical Corp. v. Bur-roughs Corp., supra,* 21 U.C.C. Rep. at 1296; *K–Lines, Inc. v. Roberts Motor Co.,* 273 Or. 242, 541 P.2d 1378, 1384 (1975); *K & C, Inc. v. Westinghouse Electric Corp.,* 437 Pa. 303, 308, 263 A.2d 390, 393 (1970). *See also Investors Premium Corp. v. Burroughs Corp., supra,* 389 F.Supp. at 45. Especially in light of that presumption, Earman has fallen far short of proving unconscionabil-ity.[22]

AFFIRMED.

**22.** The District Court stated:

Pursuant to the terms of Florida Statute 672.-302 the Court invited counsel to present evi-dence concerning the question of unconscion-ability before the Court. Counsel presented no evidence at that time, but rather relied upon the pleadings, motions, memoranda and the pretrial stipulation as stating the facts on the case.
*See also Cyclops Corp. v. Home Insurance Co.,* 389 F.Supp. 476, 482–83 (W.D.Pa.), *aff'd mem.,* 523 F.2d 1050 (3d Cir. 1975).